**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 3:06-0900** |
| | ) | **Judge Trauger** |
| **and** | ) | |
| | ) | |
| **JOHN DOE,** | ) | |
| | ) | |
| **Plaintiff-Intervenor,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **FORD MOTOR CREDIT COMPANY,** | ) | |
| | ) | |
| **Defendant/Counter-Plaintiff and** | ) | |
| **Counter-Plaintiff** | ) | |

## MEMORANDUM

The defendant has filed a Motion for Summary Judgment (Docket No. 48), to which the

plaintiff and plaintiff-intervenor have responded (Docket Nos. 58, 62), and the defendant has

replied (Docket No. 68). For the reasons discussed herein, the defendant's motion will be

denied.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff-intervenor John Doe began work for defendant Ford Motor Credit Company

("FMCC") in approximately June 2000, and became a full-time employee in March 2001.[1] In

---

[1]Unless otherwise noted, the facts have been drawn from the plaintiff's Complaint
(Docket No. 1), the plaintiff-intervenor's Complaint in Intervention (Docket No. 24), the
plaintiff's Memorandum in support of its Response to the defendant's Motion for Summary
Judgment (Docket No. 59), the plaintiff's Response to the defendant's Statement of Material
Facts (Docket No. 60), the plaintiff's Additional Statement of Material Facts (Docket No. 61),

1

early 2002, Mr. Doe was diagnosed with HIV. Following this diagnosis, Mr. Doe's primary care physician enrolled him in a double-blind study at the Vanderbilt Comprehensive Care Center, requiring that Mr. Doe report to the Care Center for blood draws. The study required that Mr. Doe have his blood drawn once a week for a number of months, once every two weeks for an additional period of time, and then once every three weeks. Mr. Doe's participation in this study paid for his HIV medications.

In the early stages of the study, Mr. Doe was required to give blood at the Care Center once a week, between Tuesday and Thursday[2]. Mr. Doe was wary of giving his direct supervisor, Chandra Chisom, the reason for his absence on those days, because he believed Ms. Chisom to be a gossip and feared that she would tell his coworkers that he was inflicted with HIV. Accordingly, in early 2002, Mr. Doe approached manager Danny Dunson to ask for a schedule accommodation, so that he could participate in the clinical study without negative repercussions at work. Mr. Doe had been "written up" on February 14, 2002, for missing work

and the plaintiff-intervenor's Response to the defendant's Statement of Material Facts (Docket No. 63).

[2]In its Statement of Material Facts, the plaintiff alleges that "Participating in the study required Doe to go to the Center for blood draws every Tuesday and Thursday, which conflicted with his normal hours of work." (Docket No. 61 at ¶ 3) The defendant disputes this allegation as inconsistent with the plaintiff's admission that Mr. Doe was required to have blood drawn only once a week (*Id.* at ¶ 1), and with Mr. Doe's deposition transcript. The defendant is correct. The plaintiff has provided no factual support for its allegation that Mr. Doe was required to give blood twice a week. In fact, when questioned on this subject at his deposition, Mr. Doe stated that "you went in for blood draws once a week for so many months," before the blood draws actually decreased in frequency. (Doe Dep., Docket No. 64, Ex. 1 at p. 38) Because the blood draws could not be performed on Mondays or Fridays, Mr. Doe testified, "I would have to go down between Tuesday and Thursday for blood draws." (*Id.* at p. 39) Mr. Doe did not testify that he had to have his blood drawn on both Tuesday and Thursday; rather, his testimony seems to foreclose that contention.

2

in order to attend medical appointments and so was concerned that he might be fired for taking additional time off without explanation. Mr. Doe requested that he be able to work four extended-hour days rather than the regular five-day schedule followed by the other employees.

Mr. Doe alleges that he first told Mr. Dunson that he would need the accommodation because of a "medical condition," without going further into specifics. (Docket No. 61 at ¶ 4) Mr. Dunson demanded to know what the specific diagnosis was, stating, "I have to know why, actually, to accommodate you when other people are coming and asking for accommodations and I turn them down, why am I going to give you an accommodation?" (*Id*. at ¶ 6) Mr. Doe replied that it was confidential and that there was a stigma attached. Mr. Dunson said, "In order for me to accommodate your schedule, I need to know what's going on." (*Id*.) Mr. Doe told Mr. Dunson that he had been diagnosed with HIV.[3]

Only after Mr. Doe had disclosed this information did Mr. Dunson refer him to Sue

---

[3] The defendant has alleged that these statements contradict an e-mail Mr. Doe sent to Connie Bond, an employee of FMCC, pursuant to FMCC's own investigation. There is no contradiction. In the e-mail, the plaintiff-intervenor states, "I didn't trust my direct supervisor Chandra Chisom with this information so I went to my COM Danny Dunson. I explained to him that this was highly confidential information; I told him about my diagnosis that I would need to go to the doctor a few times a week at first and it would gradually be less as the study program continued." Although Mr. Doe does not, in this e-mail, recite the conversation between himself and Mr. Dunson, neither does he say that he volunteered his diagnosis without any questioning. This omission is quite understandable in light of the fact that the e-mail was sent pursuant to an investigation of Chandra Chisom, and not Danny Dunson. The exact contents of the earlier conversation between Mr. Doe and Mr. Dunson was simply not very relevant to the inquiry. Certainly, Mr. Doe was not required to list all facts relevant to this lawsuit in that e-mail. There is no contradiction here. Neither do the intake notes recorded by an employee of the EEOC contradict the plaintiff's statements. The intake notes, which consist of fragments of sentences presumably recorded during or after a meeting between an EEOC employee of the plaintiff, simply do not detail the contents of Mr. Doe's conversation with Mr. Dunson. Moreover, the notes cannot be taken for Mr. Doe's own statements. Mr. Doe's case cannot be limited to the contents of unsigned written statements recorded by someone else.

Geisen, an occupational health nurse, to discuss his rights under the Family Medical Leave Act ("FMLA"). Ms. Geisen is not an employee of FMCC, but is instead an independent contractor. Mr. Doe alleges that he did not even know that the FMLA existed, much less the parameters of his rights under that statute, until Mr. Duson provided him with this information.[4]

Mr. Doe met with Ms. Geisen later that day. Ms. Geisen told him that he was not required to answer any questions about his medical condition or divulge his medical information to anyone but her. However, Mr. Doe alleges that Ms. Geisen did not, specifically, tell him what to do if a manager or supervisor asked him about his FMLA leave. Ms. Geisen did tell Mr. Doe that he was to give his medical records and FMLA requests directly to her and that she would keep the records confidential. Ms. Geisen did keep those forms confidential.

Several weeks later, in March or April 2002, Mr. Dunson summoned Mr. Doe into his office. Mr. Dunson told Mr. Doe that Chandra Chisom was giving him "a hard time" because he would not tell her the specific reason for Mr. Doe's absence from work. Mr. Doe said that he did not want Ms. Chisom to know his diagnosis. Mr. Dunson told Mr. Doe that he had told Ms.

---

[4]The plaintiff alleges that FMCC had not previously provided Mr. Doe with any information about the FMLA or his rights under that statute and that it had not posted the notices in his work area. The defendant, however, alleges that it "takes extensive steps to ensure that all of its employees are aware of FMCC's FMLA policy and the procedures involved in taking FMLA leave." (Docket No. 69 at ¶ 7) FMCC alleges that it "conducted FMLA training during new hire orientation" and that its policies and procedures were posted online, as well as on the floor on which Mr. Doe worked. (*Id.* at ¶ 8). Ms. Chisom testified at her deposition that she did not remember whether the required notices were posted. (*Id.*) The parties agree, however, that FMCC's FMLA policy requires employees to review the policy with their supervisors or managers as part of the process of the employees' application for FMLA leave and that, subsequently, the employee must answer questions on the FMLA application regarding this conversation. (*Id.*) Further, the policy did not specifically mention Ms. Geisen's role. (*Id.*) Therefore, even if an employee were to scrutinize the defendant's FMLA policy, he or she would be led by that policy to consult with a manager or supervisor about obtaining leave and would not know to go to Ms. Geisen before having done so.

Chisom to "let it be."  (Docket No. 59 at p. 4)  Nevertheless, after several more weeks passed,

Mr. Dunson called Mr. Doe into his office again and told Mr. Doe that they needed to tell Ms.

Chisom the reason why Mr. Doe was missing work.  Mr. Doe said, once again, that he did not

want her to know.  Mr. Dunson said that he did not trust Ms. Chisom with the information

because she "told other people everything she knows."  (*Id*.)  Mr. Doe said that, according to Ms.

Geisen, he did not have to tell anyone his medical information.

Nevertheless, Mr. Dunson picked up the phone and called Ms. Chisom, requesting that

she come to his office.  After she arrived, Mr. Dunson told Ms. Chisom that the information she

was about to receive was confidential and that she could lose her job if she disclosed it to anyone

else.  Ms. Chisom said that she understood.  Then Mr. Dunson told Ms. Chisom that Mr. Doe

had HIV.  Mr. Doe remained present in the room throughout this conversation.

At a later time, Ms. Chisom told Mr. Doe that, going forward, she would maintain a file

containing his medical excuses at her desk.  Mr. Doe complied, giving Ms. Chisom the excuses,

although Ms. Geisen had told him that he was not required to give her the excuses.  According to

the plaintiff, as a practical matter, it is very difficult for an hourly employee to resist a demand

for medical excuses from his immediate supervisor on the directive of an independent contractor

industrial nurse.  (Docket No. 60 at ¶ 28)  Ms. Chisom kept this file until she was informed by

superiors at FMCC that she was not permitted to maintain it, at which time she returned it to Mr.

Doe.

Chandra Chisom told Monica Chisom and Tracie Johnson about Mr. Doe's medical

condition at some time between February 2002 and April 2005.  (*See* M. Chisom Dep., Docket

No. 73, Ex. Ex. 7 at p. 2; T. Johnson Dep., Docket No. 73, Ex. 6 at p. 2)  Tracie Johnson herself

told one other person.[5]  The fact that Chandra Chisom informed Mr. Doe's coworkers about his

medical condition was subsequently confirmed by the defendant's own internal investigation.

Mr. Doe suffered shame, embarrassment, and depression as a result of this disclosure.  He took a

leave of absence shortly after finding out about it, during which he sought medical treatment.

When he returned from the leave of absence, the defendant laid him off, but he was subsequently

rehired.

Mr. Doe contacted the defendant's human resources department shortly after he

discovered that Ms. Chisom had divulged his medical information to his coworkers, informing

them of the disclosures.  FMCC conducted an investigation and initially determined that Ms.

Chisom had not violated the non-disclosure rule.  However, after Mr. Doe protested, FMCC

reinvestigated the matter, confirmed that Chandra Chisom had, in fact, violated company policy,

_____

[5]The defendant seeks to bar these allegations, arguing that they amount to hearsay.  *See
Sperle v. Mich, Dept. of Corr.*, 297 F.3d 483, 495 (6th Cir. 2002) ("A party opposing a motion
for summary judgment cannot use hearsay or other inadmissable evidence to create a genuine
issue of material fact.")  The statements are not hearsay.  Hearsay is an out of court statement
offered for the truth of the matter asserted.  Fed. R. Evid. 801(c).  An out of court statement
offered to serve some other purpose is not hearsay and may be considered by the trier of fact.
*See Browne v. Signal Mountain Nursery*, L.P., 286 F. Supp. 2d 904, 924 (E.D. Tenn. 2003).  The
statements at issue have not been offered to demonstrate the truth of the matter asserted.  In fact,
the matter asserted—that Mr. Doe has AIDS—is, according to both parties, not true.  Mr. Doe
has HIV and the disease has not yet progressed to AIDS.  The statements have been offered not
to demonstrate the truth of the underlying assertions but to demonstrate that Ms. Chisom
divulged Mr. Doe's medical information to those individuals.  *Martin v. City of Indianapolis*,
192 F.3d 608, 613 (7th Cir. 1999) (holding that statements offered to show that the declarants
said them were not hearsay); *U.S. v. Khalil*, 279 F.3d 358, 364 (6th Cir. 2002) (FBI agent's
testimony that he had "an awareness as to whether [the defendant] was engaging in drug
trafficking," based on statements of others, was not hearsay when used to explain the basis for
the FBI's investigation).  Accordingly, the court may consider this evidence.  However, the
plaintiff has also proffered evidence that Chandra Chisom told other members of Mr. Doe's team
that he had AIDS, the basis of which is Mr. Doe's own deposition testimony that he was told so.
This testimony is hearsay, and cannot be considered by the court.

6

and terminated her.

More than thirty days prior to the institution of this action, Mr. Doe filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging violations of the Americans with Disabilities Act ("ADA") against FMCC.  On September 20, 2006, the EEOC filed this action on behalf of Mr. Doe, alleging that FMCC had engaged in unlawful employment actions in violation of §§ 102(d)(3)(B), (d)(3)(C), and (d)(4)(C) of the ADA.  42 U.S.C. § 12112(d)(3)(B), (d)(3)(C), and (d)(4)(C).  (Docket No. 1)  On December 20, 2006, Mr. Doe filed a Motion to Intervene (Docket No. 15), which the court granted on January 16, 2007.  (Docket No. 19)  Mr. Doe, in his Complaint in Intervention, alleged violation of the same provisions of the ADA as were alleged in the Complaint filed by the EEOC, as well as several state law claims that were subsequently dismissed by agreed order on October 29, 2007.  (Docket No. 56)  On October 26, 2007, the defendant moved for summary judgment on the remaining claim under the ADA.  (Docket No. 48)

## ANALYSIS

### I.      Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  To prevail, the moving party must demonstrate the absence of a genuine issue of material fact as to an essential element of the opposing party's claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

7

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Our function "is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case—provided that the nonmoving party bears the burden for that element—the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To avoid summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002). And we must keep in mind that "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. Finally, "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49). With this standard in mind, the court turns to

8

an analysis of the plaintiff's claims.

## II. Unlawful Disclosure Under The ADA

The ADA strictly limits the type of inquiries an employer may make regarding its employees' medical conditions as well as the uses to which this information may be put once it is gathered. Under the ADA, employers "shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). An employer "may conduct voluntary medical examinations" as well as "make inquiries into the ability of an employee to perform job related functions." 42 U.S.C. § 12112(d)(4)(B). However, all information obtained under that provision is subject to the following restrictions:

> [I]nformation obtained regarding the medical condition or history of the applicant is collected and maintained on separate forms and in separate medical files and is treated as a confidential medical record, except that—(i) supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations; (ii) first aid and safety personnel may be informed, when appropriate, if the disability might require emergency treatment; and (iii) government officials investigating compliance with this chapter shall be provided relevant information on request . . . .

42 U.S.C. § 12112(d)(3)(B); *see also* 29 C.F.R. §§ 160.13, 160.14.

The plaintiff alleges that the defendant violated the above provision when his direct supervisors disseminated the plaintiff's medical information to his coworkers. The information was not obtained pursuant to a medical examination. Therefore, in order to demonstrate an unlawful disclosure under the ADA, the plaintiff must show that the defendant obtained knowledge of Mr. Doe's medical condition pursuant to an inquiry and that the information was

not protected by the defendant as required by § 12112(d)(3)(B).[6]

## A. Whether The Disclosure Was In Response To An Inquiry

The defendant alleges that no inquiry occurred when Mr. Doe and Mr. Dunson discussed

his HIV status for the first time and, therefore, that the information was disclosed voluntarily.

Voluntarily disclosed information is not protected by the ADA.  *See Yoder v. Ingersoll-Rand*

*Co.*, 172 F.3d 51 (Table) (6th Cir. 1998); *Cash v. Smith*, 231 F.3d 1301, 1307 (11th Cir. 2001).

However, viewing the evidence in the light most favorable to the plaintiff, there remains an issue

for trial as to whether Mr. Dunson's questioning of Mr. Doe amounted to an inquiry, and as to

---

[6]The defendant argues that the ADA does not protect medical information, but only medical records.  Under this novel interpretation of the statutory language, an employer would be permitted to disseminate otherwise confidential medical information about its employees by word of mouth so long as it treated the forms on which the information was written as a "confidential medical record."  This reading of the statute is unsupported by express statutory language, case law, and common sense.  Section 12112(d)(4)(C) states: "*Information* obtained under subparagraph (B) regarding the medical condition or history of any employee are subject to the requirements of subparagraphs (B) and (C) of paragraph (3)."  42 U.S.C. § 12112(d)(4)(C) (emphasis added).  Under this express language, the provisions of § 12112(d)(3)(B), set forth above, restrict access to *information*.  The statute requires that medical information be treated as a confidential record; this requirement is not satisfied be creating a confidential record and spreading the information through another means.  *See* 29 C.F.R. Pt. 1530, App. § 1630.14(c) ("The information obtained in the course of such examination or inquiries is to be treated as a confidential medical record and may only be used in a manner not inconsistent with this part.")  Not surprisingly, the federal courts have treated § 12112(d) as protecting information, and not just the pieces of paper on which the information is written.  For instance, in *Doe v. United States Postal Service*, 317 F.3d 339, 440 (D.C. Cir. 2003), the court found that evidence indicating that the plaintiff's supervisor "told co-workers about his HIV status" was sufficient to survive summary judgment on the plaintiff's ADA (and other) claims.  The court held that "[s]ection 12112(d)'s confidentiality requirement . . . ensur[es] that the *information* disclosed pursuant to an employer's medical inquiry spreads no farther than necessary to satisfy the legitimate needs of both employer and employee."  *Id.* at 442.  It did not matter in *Doe* that the information had been spread verbally.  *Id.*, *see also Fleming v. State University of New York*, 502 F. Supp. 2d 324, 328 (E.D.N.Y. 2007) ("Such *information* may be divulged only to work supervisors where relevant to necessary restrictions or accommodations, to government officials investigating ADA compliance, or to first aid and safety personnel.") (emphasis added).  The ADA protects information, and not just records.

10

whether the resulting disclosure was voluntary.

*Doe v. United Postal Service*, 317 F.3d 339, 341 (D.C. Cir. 2003), is closely analogous to the case at hand. In *Doe*, an HIV-positive employee of the Postal Service disclosed his HIV status to superiors by completing and submitting an FMLA form, without which he could not obtain FMLA leave to cover his absences. *Id*. When the plaintiff returned to work, he discovered that his HIV status had "become common knowledge to his co-workers, many of whom commented to him about it." *Id*. The plaintiff's claim arose under the Rehabilitation Act, but the relevant provisions were identical to those that apply in the present case, under the ADA. *Id*. Contrasting *Cash v. Smith*, 231 F.3d at 1303-04, where the plaintiff had disclosed her medical condition to her boss "in confidence" but not pursuant to an FMLA request (which she made after her disclosure) nor in response to any specific questioning, and had, in addition, "freely discussed her illness with other . . . employees," the court in *Doe* found that "[i]t was . . . the Postal Service, acting pursuant to [the FMLA's] statutory authorization, not Doe, that initiated the inquiry into his medical condition by asking for this medical certification." *Doe*, 317 F.3d at 442.

The court in *Doe* found that the plaintiff "revealed his medical diagnosis . . . only after the Service, through his direct supervisor, told him in writing that he would face disciplinary proceedings unless he completed either the FMLA form or a medical certificate explaining the nature of his illness." *Id*. (internal quotations omitted). Accordingly, the court reasoned that, even if the plaintiff "can be said to have submitted the FMLA request voluntarily, . . . that hardly means he volunteered his medical diagnosis." *Id*. Instead, the court found that conditioning the plaintiff's eligibility for FMLA leave on submission of medical documentation constituted an

11

"inquiry" into that information.  *Id.*  Otherwise, employees could be forced "to choose between waiving their right to avoid being publicly identified as having a disability and exercising their statutory rights," including their rights under the FMLA.  *Id.*  This result would be contrary to Congress's stated purpose in enacting the ADA, which was "at least in part, to permit employers to inquire into employees' medical conditions . . . while avoiding subjecting employees to the 'blatant and subtle stigma' that attaches to 'being identified as disabled.'"  *Id.* (quoting H.R.REP. No. 101-485, pt. 2, at 75 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 357-58); *see also* 29 C.F.R. pt. 1630, App. ("The ADA is . . . designed to remove barriers which prevent qualified individuals with disabilities from enjoying the same employment opportunities that are available to persons without disabilities.").

The reasoning in *Doe* applies with equal force to the case at hand.  Although Mr. Doe, in the present case, did not himself mention the FMLA during his conversation with Mr. Dunson, he was seeking permission for medical leave.  Whether or not Mr. Doe uttered "FMLA," his request fell under the purview of that statute:  he was requesting medical leave.  In *Doe*, it was not the mere invocation of the letters FMLA that created an "inquiry," but rather, the conditioning of the plaintiff's *rights* under that statute on his providing the medical information. In the present case, the plaintiff's right to medical leave under the FMLA was no less conditioned on his response to Mr. Dunson's questioning.  Moreover, unlike the plaintiff in *Doe*—who merely filled out a form—the plaintiff-intervenor in this case was actually told by a supervisor that he must disclose the information at issue before he would be given an accommodation.  Even after Mr. Doe stated that he did not want to give the specific reason, his supervisor pressed him.  In no sense can Mr. Doe's disclosure be said to be voluntary.  When a

12

supervisor asks an employee for information, and will not take no for an answer, that is an inquiry.

Nor does it provide a basis for granting summary judgment that the defendant had enacted an official policy regarding FMLA confidentiality. Putting aside Mr. Doe's allegations that he was unaware of any FMLA policy and that the policy was not posted in Mr. Doe's workspace, the salient point here is that neither Mr. Dunson nor Ms. Chisom followed any policy of confidentiality. The defendant has cited no case law indicating that, under the ADA, a disclosure is voluntary provided that a policy says the employee may keep his medical information to himself, in the face of an actual practice to the contrary. In fact, this position would run counter to the purpose of the ADA "to permit employers to inquire into employees' medical conditions . . . while avoiding subjecting employees to the 'blatant and subtle stigma' that attaches to 'being identified as disabled.'" *Doe*, 317 F.3d at 341. It gives no purchase that, on paper, Mr. Doe was not required to give Mr. Dunson this information if, in fact, Mr. Dunson told him that he could not obtain leave without divulging it.

Moreover, it appears that under this policy Mr. Doe would have been required to interact with a supervisor before obtaining FMLA leave.[7] That is the course of action that Mr. Doe actually followed. Since, Mr. Doe's supervisors demanded that he disclose what his particular medical diagnosis was, even if Mr. Doe had known about the policy, he still may have been put in the position of having to disclose his medical condition to his supervisors before obtaining FMLA leave. Under *Doe*, such a disclosure could not be termed "voluntary." *Doe*, 317 F.3d at

_____

[7]The Policy provides that, after the employee reviews his or her rights on "HR Online," he or she must review the policy with a "supervisor/manager." (Docket No. 64, Ex. 9 at p. 2) Next, the employee must fill out an online form, which includes a question related to the supervisor discussions, before FMLA leave can be obtained. (*Id.*)

341.

Finally, it bears noting that Mr. Doe had already been "written up" for missing work for medical purposes and could credibly fear disciplinary action for taking leave without pursuing his rights under the FMLA. As in *Doe*, but unlike *Cash*, the plaintiff-intervenor's FMLA leave was *de facto* conditioned on disclosing his HIV status.[8] According to the facts taken in a light most favorable to the plaintiff, Mr. Doe did not disclose his HIV status voluntarily, but rather in response to an inquiry by his employer.

### B.     Whether The Inquiry Was Job-Related

The defendant alleges that the inquiry was not job-related and, therefore, no confidentiality requirement applies to it. On this issue, *Doe* is, once again, instructive. After finding that the plaintiff's disclosure was in response to an inquiry and was not voluntary, the court also found that the FMLA form was related to "the ability of an employee to perform job related functions" under § 12112(d)(4)(B). *Doe*, 317 F.3d at 345. Whether or not an employee can show up for work is quite clearly a job-related question. Perhaps for that reason, the ADA lists, under its definition for a "reasonable accommodation," "job restructuring, part-time or modified work schedules." § 12111 "Definitions"; *see also* 29 C.F.R. § 1630.2; *Ward v. Massachusetts Health Research Institute, Inc.*, 209 F.3d 29, 34 (1st Cir. 2000) ("The ADA explicitly states that 'job restructuring' and 'part-time or modified work schedules' are potential

---

[8]The defendant cites a multitude of cases in support of its argument that Mr. Doe's disclosure was voluntary, and not in response to an inquiry. Those cases do involve voluntary disclosures and, for that reason, are not analogous to the case at hand. In none of the cases cited by the defendant was an employee actually told by a supervisor that he or she must divulge medical information in order to obtain a schedule accommodation. *See, e.g., Anderson v. Arizona*, 2007 WL 14623 at *8 (D. Ariz. 2007) (plaintiff's disclosure was undisputedly voluntary).

14

reasonable accommodations.").  Since a "reasonable accommodation" analysis only comes into play if, due to disability, the employee cannot otherwise perform an essential job function, *see Hendrick v. Western Reserve Care System*, 355 F.3d 444, 457 (6th Cir. 2004), it stands to reason that those accommodations are themselves job-related.  Perhaps for this reason, many federal courts have explicitly held that attendance at work is an essential job function.  *See, e.g., Brenneman v. MedCentral Health System*, 366 F.3d 412, 420 (6th Cir. 2004) ("[R]egular attendance is an essential function of the Pharmacy Technician position."); *Pickens v. Soo Line Railroad Co.*, 264 F.3d 773, 777 (8th Cir. 2001) ("This court has consistently held that regular and reliable attendance is a necessary element of most jobs."); *Salmon v. Dade County School Board*, 4 F. Supp. 2d. 1157, 1161 (S.D. Fla. 1998) (holding that "punctual attendance is an essential requirement" for a school guidance counselor); *Rodriguez v. Loctite Puerto Rico, Inc.*, 967 F. Supp. 653, 661 (D. Puerto Rico, 1997) ("[A] basic function of any full time job is showing up for work.").

It is quite clear that the plaintiff-intervenor's request for a schedule accommodation was related to his job.  Because Mr. Dunson conditioned that leave on Mr. Doe's response to his inquiry, that inquiry was also job-related.  In *Sullivan v. River Valley School Dist.*, 197 F.3d 804, 813 (6th Cir. 1999), the Sixth Circuit held that an examination satisfies the "job-related" requirement of § 12112(2)(4)(A) when there is "evidence sufficient for a reasonable person to doubt whether an employee is capable of performing the job."  When Mr. Doe stated that he needed a schedule change, a reasonable person could have doubted whether he was capable of adhering to the work schedule.  Accordingly, the inquiry was job-related and consistent with business necessity, and it falls under the rubric of § 12112(2)(4)(A).  *See EEOC v. Prevo's*

15

*Family Market, Inc.*, 135 F.3d 1089, 1103 (noting that inquiries are job-related and serve a legitimate business purpose "if an employee requests an accommodation").

It bears noting, in addition, that, were Dunson's inquiry to be found unrelated to Mr. Doe's job functions, it would have violated § 12112(2)(4)(A) of the ADA. *See EEOC v. Prevo*, 135 F.3d at 1094; *Farmiloe v. Ford Motor Co.*, 277 F. Supp. 2d 778, 782 (N.D. Ohio 2002) ("[T]he ADA limits an employer's ability to request unfounded examination to prevent 'the unwanted exposure of the employee's disability and the stigma it may carry.'") (quoting *Sullivan v. River Valley School Dist.*, 197 F.3d 804, 812 (6th Cir. 1999)). The ADA does not explicitly state that information obtained as a result of an illegal inquiry must be kept confidential. Instead, the statutory language first defines two narrow situations where medical information may be obtained from an employee—pursuant to "voluntary medical examinations" and "inquiries into the ability of an employee to perform job related functions," 42 U.S.C. § 12112(d)(4)(B)—and then applies the confidentiality provision of § 12112(d)(3)(B) to all information so obtained. However, it would hardly fit within the stated purpose of the ADA—to "remove barriers which prevent qualified individuals with disabilities from enjoying the same employment opportunities that are available to persons without disabilities," 29 C.F.R. pt. 1630, App.—if the statute gave cover to employers who did not keep employee medical information confidential on the grounds that the employers had no right to demand the information in the first place. Because the defendant's inquiry in the case at hand was an inquiry "into the ability of an employee to perform a job related function," however, the confidentiality provision directly applies, and this issue need not be resolved.

In its reply memorandum, the defendant argues that the inquiry was not "job-related"

16

because Mr. Doe, without obtaining leave, could still have made it to his medical appointments. This argument is not convincing. The underlying merit of Mr. Doe's request for medical leave is not at issue in this case.[9] The issue is only whether Mr. Doe requested medical leave, and if Mr. Dunson's inquiry into his medical condition was in response to that request. It is undisputed that the plaintiff-intervenor went to his supervisor because he was concerned about missing work and that he requested an accommodation due to his illness, an accommodation that was ultimately granted by the defendant. At the time, with the benefit of full scrutiny, the defendant found that Mr. Doe's medical condition did require his taking the leave; now the defendant disputes the wisdom of that decision. However, whether or not it was a wise decision, it was still a decision that was related to Mr. Doe's medical condition. The *rationale* for the schedule accommodation was that Mr. Doe had HIV and needed to participate in a study. It is the nature of the defendant's inquiry, and not the ultimate merits of Mr. Doe's request for accommodation, that controls this issue. Because Mr. Doe said that he needed the leave due to his medical condition and, on that basis, Mr. Dunson asked Mr. Doe what his medical condition was, the inquiry falls under § 12112(d)(4)(B), and the confidentiality requirement applies.

### C.     Whether There Was A "Tangible Injury"

Finally, the defendant points to language from the Eighth Circuit indicating that

_____

[9]It is far from clear from the record that Mr. Doe could have made it to the Vanderbilt Clinic as required for participation in the study without obtaining leave. It is true that Mr. Doe only had to go to the clinic once per week, on Tuesday, Wednesday, or Thursday. According to the defendant, in any given week, one of those days would be a "late shift" day, on which the plaintiff-intervenor needed only to attend work from 12:00 noon until 9:00 p.m. Neither the plaintiff nor the plaintiff-intervenor have contradicted the defendant's evidence in support of that contention. However, it is not clear whether Mr. Doe, himself, could choose which day to go to the clinic, and it is not clear at what time of day Mr. Doe needed to be there or for how long. It could be that, even on the late-shift day, Mr. Doe would not be able to make his appointment at the clinic without missing work.

17

violations of the ADA's confidentiality requirements are not actionable unless they result in a "tangible injury." *See Cossette v. Minnesota Power & Light*, 188 F.3d 964, 970 (8th Cir. 1999) ("[Plaintiff] must also establish that MP & L and Burton's violation of the ADA caused some sort of tangible injury."); *McPherson v. O'Reilley Automotive, Inc.*, 491 F.3d 726, 732 (8th Cir. 2007) ("[Plaintiff] must show . . . that the disclosed information was confidential and that he suffered some kind of tangible injury as a result of the disclosure.")  Assuming that the Sixth Circuit would adopt this requirement, the court finds that the plaintiff has met it.  The plaintiff has alleged—and the defendant has admitted—that Mr. Doe suffered shame, embarrassment, and depression as a result of the disclosure of his HIV status to his coworkers.[10]  These are tangible injuries.

In *Cossette*, the plaintiff alleged that, as a result of her manager's disclosing to her coworkers that she suffered from back problems and "perceived intellectual deficiencies," her coworkers had "treated her in a condescending and patronizing fashion."  *Cossette*, 188 F.3d at

---

[10]In addition, the defendant argues that Ms. Chisom was "acting outside of the scope of her employment" when she disclosed Mr. Doe's medical information to his coworkers, citing no case law in support of this argument.  The ADA does not state that a disclosure must be made pursuant to an employee's official job duties in order for it to be actionable.  Indeed, the court can imagine few occupations in which divulging the confidential medical information of one's subordinate to other coworkers would be listed in the job description.  The defendant is a private entity and is subject to traditional *respondeat superior* liability.  *See Roberts v. U.S.*, 191 Fed. Appx. 338, 343 (6th Cir. 2006) ("It is clear that under federal case law, an employee may engage in conduct that is not condoned by the employer—even in violation of the employer's policies—and still be within the scope of his or her employment . . . [and] [u]nder Tennessee law, an employee can act within the scope of his employment even when committing wanton or willful torts against another.") (internal quotations and citations omitted); *see also Arbour v. Jenkins*, 903 F.2d 416, 422 (6th Cir. 1990); *Johnson v. Chapman*, 327 F. Supp. 2d 895, 899 (E.D. Tenn. 2004) ("Plaintiff's allegations that [the individual defendant] acted with vindictiveness and malice are not enough to overcome substitution where, even if true, [the employee's] actions appear to have been taken within her authority as a federal employee during the course of her employment.").  The court cannot grant summary judgment on this basis.

18

971.  The court held that this allegation "fell short of an adverse employment action" that would establish a claim of discrimination under § 12112(a); however, the court did not hold that the allegations necessarily fell short of the "tangible injury" requirement for a wrongful disclosure claim under § 12112(d).  *Id*. at 971-72.  In fact, the court noted that "[t]he parties have not briefed whether such treatment suffices to create a claim of illegal disclosure of medical information" and ultimately reversed the district court's grant of summary judgment on that claim "so that this issue may first be considered by the district court."  *Id*.

Other courts have held that the "tangible injury" requirement applies to wrongful disclosure claims; *see Garrison v. Baker Hughes Oilfield Operations, Inc.*, 287 F.3d 955, 963 (10th Cir. 2002) ("[A] claimaint may recover compensatory damages for tangible injury legally and proximately caused by violation of § 12112(d)(3).") (internal quotations omitted); however, they have not held that non-economic harms necessarily fail to meet that standard.  Instead, courts have held that this requirement is met whenever an articulable injury can be identified. For instance, in *O'Neal v. City of New Albany*, 293 F.3d 998, 1007 (7th Cir. 2002), the Court of Appeals for the Seventh Circuit held that a § 12112(d) claim had passed the "tangible injury" requirement where the proposed injury was the plaintiff's failure to be hired and yet, regardless of the medical examination, the plaintiff could not legally have been hired because of his age.[11] In contrast, the court in *Johnson v. Moundsvista, Inc.*, No. Civ. 01-915 DWF/AJB, 2002 WL

---

[11]In addition, the court in *O'Neal* noted only that the "tangible injury" requirement had been applied in prior cases involving plaintiffs *without a disability*.  *Id*. at 1007 ("[C]ourts have required that a nondisabled plaintiff *at least* show some tangible injury-in-fact caused by the § 12112(d) violation") (emphasis in original).  In the case at hand, the plaintiff-intervenor is, in fact, disabled.  *See Bragdon v. Abbott*, 524 U.S. 624, 637 (1998) ("HIV infection satisfies the statutory and regulatory definition of a physical impairment during every stage of the disease.").  Accordingly, this language could be taken as support for a finding that the "tangible injury" rule does not even apply to the case at hand.

19

2007833 at *5 (D. Minn. 2002), found that the "tangible injury" requirement had not been met because the plaintiff did not "allege that she was treated at all differently by her coworkers after the alleged disclosure."

Neither the defendant nor the court has identified any case in which the "tangible injury" rule was applied to bar emotional or non-economic damages for claims arising from violations of § 12112(d)(3). In fact, the Sixth Circuit has long recognized non-economic harms as legitimate bases for recovery of compensatory damages. *See, e.g., Thompson v. Office and Professional Employees International Union*, AFL-CIO, 74 F.3d 1492, 1508 (6th Cir. 1996) ("Generally, this circuit allows damages for emotional distress to be awarded 'upon a showing of intimidation, maritial problems, weight loss, loss of sleep, shock, or humiliation.'") (quoting *Holmes v. Donovan*, 984 F.2d 732, 739 (6th Cir. 1993)); *Memphis Cmy. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986) ("[C]ompensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as impairment of reputation, personal humiliation, and mental anguish and suffering.") (internal quotations and alterations omitted).

Perhaps for this reason, the Sixth Circuit and other circuits have upheld compensatory damages for emotional harm under different subsections of the ADA. *See Knight v. The Metropolitan Government of Nashville and Davidson County, Tennessee*, 136 Fed. Appx. 755, 762 (6th Cir. 2005) (upholding the district court's failure to grant remittitur for an award of damages for emotional pain and mental anguish in an ADA case); *Tramill v. United Parcel Service*, 10 Fed. Appx. 250, 255 (6th Cir. 2001) (upholding the district court's award of damages for emotional distress and humiliation in an ADA case against arguments that the damages should have been higher); *EEOC v. Convergys Customer Management Group, Inc.*, 491 F.3d

790, 797 (8th Cir. 2007) ("A plaintiff may seek compensatory damages under the ADA for emotional distress.").

In the case at hand, the defendant has admitted that the plaintiff suffered shame, embarrassment, and depression as a result of the disclosure of his medical condition to his coworkers. The plaintiff-intervenor has offered testimony to this fact, which is itself competent evidence of emotional distress. *See id.* ("While compensatory damages for emotional distress must be supported by competent evidence of genuine injury, a jury may award such damages based solely upon a plaintiff's testimony."). The fact that the plaintiff had to take a medical leave of absence shortly following the disclosure also supports his allegation of emotional distress. This evidence more than satisfies the plaintiff's burden on summary judgment to demonstrate a "tangible injury." Summary judgment cannot be granted on this ground.

## CONCLUSION

For the reasons stated herein, the defendant's Motion for Summary Judgment will be denied.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

21